```
 1                UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS
 2


 3


 4      * * * * * * * * * * * * *
        RADIUS HEALTH, INC., AND    *
 5      IPSEN PHARMA S.A.S          *
                Plaintiffs          *
 6                                  *
                                    *      CIVIL ACTION
 7              v.                  *      No. 22-11546-RGS
                                    *
 8      ORBICULAR PHARMACEUTICAL    *
        TECHNOLOGIES PRIVATE        *
 9      LIMITED                     *
                Defendant           *
10      * * * * * * * * * * * * *


11


12


13


14          BEFORE THE HONORABLE RICHARD G. STEARNS
                UNITED STATES DISTRICT JUDGE
15                   MARKMAN HEARING
                    August 1, 2023
16


17


18
                              Courtroom No. 21
19                            1 Courthouse Way
                              Boston, Massachusetts 02210
20


21          JAMES P. GIBBONS, RPR/RMR
                Official Court Reporter
22          1 Courthouse Way, Suite 7205
            Boston, Massachusetts  02210
23             jamesgibbonsrpr@gmail.com


24


25
```

1    APPEARANCES:

2          CHOATE, HALL & STEWART (By Eric J. Marandett, Esq.,
     Sophie F. Wang, Esq., Bryana T. McGillycuddy, Esq., and
3    Sara E. Ellis, Esq.) Two International Place, 100-150
     Oliver Street, Boston, Massachusetts, 02110, on behalf
4    of Plaintiffs

5          WINDELS, MARX, LANE and MITTENDORF LLP (By Alan H.
     Pollack, Esq., and Christopher E. Redwood, Esq.) 1
6    Giralda Farms, Madison, New Jersey, 07940, on behalf of
     Defendant

7
           HARBOR LAW GROUP (By Catherine I Rajwani, Esq.) 96
8    West Main Street, Suite C, Northborough, Massachusetts,
     01532, on behalf of Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S

2          THE CLERK:  All rise.

3       (Whereupon, the Court entered the courtroom.)

4          THE CLERK:  Court is open.  You may be seated.

5       This is Civil Action No. 22-11564, Radius and Ipsen

6    versus Orbicular.

7       Would counsel please identify themselves for the

8    record.

9          MR. MARANDETT:  Good afternoon, your Honor.  Eric

10   Marandett from Choate, Hall & Stewart on behalf of the

11   plaintiffs, Radius and Ipsen.  And with me also from Choate

12   are Bryanna McGillycuddy, Sophie Wang and Sara Ellis.

13      Ms. Wang and Ms. McGillycuddy will be presenting the

14   arguments today.

15      And then I also just want to introduce from Radius the

16   Chief Patent Counsel and Senior Patent Counsel, Jim

17   Harrington and Melissa Brand.

18          THE COURT:  Welcome.

19          MS. RAJWANI:  Good afternoon, your Honor.

20   Catherine Rajwani from Harbor Law Group.  I'm here on behalf

21   of the defendant, Orbicular Pharmaceutical Technologies, as

22   local counsel.

23          MR. POLLACK:  Good afternoon, your Honor.  I'm Alan

24   Pollack of the Windels Marx firm, also on behalf of

25   Obicular.  And with me is Christopher Redwood, also of the
```

1    Windels Marx firm, and I will be presenting on behalf of

2    Orbicular.

3              THE COURT:  All right.

4         Before the Court on a fairly narrow issue, which, of

5    course, is the *Markman* claim construction phase of the case

6    there aren't that many terms; in fact, a mercifully small

7    number of terms that are actually being disputed.

8         As I understand it, what we're looking at is a method

9    patent that deals with essentially the regulation of calcium

10   in the body as a means of, in this case, promoting bone

11   growth, and does so by using an identifier that indicates, I

12   think, when there is a need for medical intervention.

13        But as I understand it, the patent has nothing to do

14   with the underlying medication itself; that is, the

15   abaloparatide drug product, that that's a preexisting

16   medication.  But this is really a patent directed toward the

17   administration of the drug, and it looks as if we have

18   really just three terms that are in dispute.

19        So it being a *Markman* hearing, there is also a question

20   of "Who gets to go first," but probably we should let the

21   party defending the patent go first and then hear the other

22   side.

23             MS. WANG:  Thank you, your Honor.  And we do have

24   hard copies of the slides, which I believe are being handed

25   up.

1            (Document handed to the Court.)

2            MS. WANG:  Thank you, your Honor.  Sophie Wang on

3    behalf of Radius and Ipsen.

4        And there are, in fact, three terms there are in

5    dispute today, but before I get to the first term, which I

6    will handle, and then I will hand it off to my sister,

7    Ms. McGillycuddy, to handle the next two terms, I do want to

8    spend about five minutes just to give your Honor a little

9    bit of context about these patents because there are

10   actually four patents that are asserted in this litigation

11   that are at issue.  So it's not just one patent directed to

12   a particular method of treatment.

13       So this case concerns the branded product Tymlos, which

14   is Radius' only commercial product.  And Tymlos, as your

15   Honor noted, is a treatment for osteoporosis.  It was

16   approved in 2017 for that indication for postmenopausal

17   women.  It was also approved this past December for

18   treatment of male osteoporosis.

19       And osteoporosis is a bone disease.  It's marked by

20   loss of bone mass.  It leaves patients with weaker bones

21   overall and more susceptible to bone fractures.

22       Now, as your Honor noted, Tymlos itself, abaloparatide,

23   the compound, was an older compound.  But the innovations

24   that are at issue in this case concern the particular

25   compositions and formulations of abaloparatide that

1    ultimately were approved by the FDA.

2        So Tymlos is abaloparide.  It's a 34-amino acid

3    peptide.  And the important part about abaloparatide is

4    actually its formulation for use in this multi-use injection

5    pen that you see on Slide 3.

6        The novelty of this particular formulation is that it

7    remains stable, particularly at room temperature.  So it

8    allows a patient to take the Tymlos dose, which actually is

9    a regime of about 30 single daily doses, and take it for the

10   whole time, 30 days, and the peptide remains stable in the

11   pen the entire time.

12       The way that Tymlos works at a very high level is that

13   because it is formulated to be injected every single day,

14   the abaloparatide, once it's injected into the body, can

15   actually go and bind to cells that are in your body that

16   will actually form new bone.

17            THE COURT:  Question.

18       Does the patient inject herself, or must a doctor

19   administer the injection?

20            MS. WANG:  The patient can inject themselves, your

21   Honor.

22       And that's the beauty of the pen, is that, again, it

23   contains enough Tymlos in it to be stable for 30 days.  So

24   you don't have to refrigerate it.  You can take it with you

25   when you travel, and you can administer the dose to

1    yourself.  And upon injection, then the abaloparatide works

2    with the cells in your body to basically build new bone.

3        Now, again, the innovations in this case, the first

4    three patents at issue, talk about those compositions and

5    the formulations of abaloparatide that enable this type of

6    use, the stable compositions.

7        But the last patent at issue, which actually is

8    relevant to the first term, is dealing with a different

9    innovation entirely.  And that is the innovation of the

10    beta-Asp10 impurity, the discovery of that particular

11    impurity.

12        Now, in the course of developing Tymlos, Radius was the

13    first to discover the existence of this particular impurity.

14    And it's called "beta-Asp10" because it's actually a

15    structural change in the molecule that happens at the tenth

16    amino acid in the molecule, which is an A-S-P, an Asp,

17    aspartic acid.

18            THE COURT:  Is the ASP10 technically an isomer?

19            MS. WANG:  It can be referred to as an isomer.

20    It's a conformational change.  So it looks like -- if you

21    look at the slide, it basically is the same exact components

22    of molecule.  It's just flipped essentially in a different

23    configuration.  And because of that, it actually is

24    incredibly difficult to detect.  And before Radius found it,

25    that's why it was previously unknown, because people didn't

1    know to go look for it.

2        So the way that Radius detected it, and this is

3    relevant again for the first term, is through a series of

4    experiments that involved an analytical methodology referred

5    to as "liquid chromatography."  And I won't go into the full

6    details of this, but at a very high level these types of

7    methods allow you to separate out components within a

8    sample, such as, for example, the impurity from the actual

9    drug product, and then depict it essentially on a graph or a

10   chromatogram.

11       And the way that this works -- again, there are many

12   features and components here which are relevant to the first

13   term.  But the way that it works is that there is a solution

14   in the beginning, a mobile phase solution -- sometimes it

15   has a buffer in it; sometimes it doesn't, there's all sorts

16   of things this can go into it -- that gets pumped through a

17   column.  And as this sample gets added, it's carried in

18   through that column through the solution, and as it moves

19   through the column, the actual individual components

20   interact with the column and move at different speeds.

21       So as they move through, they are actually able to be

22   separated out from one another, and when they pass through

23   the column at the very end, they actually go through a

24   detector.  And each time a particular component is detected,

25   it registers as a peak on the chromatogram at the end.

1        At a very high level, this is the sort of methodology

2   that was used to discover this particular impurity.

3        Now, the most important thing, however, is that the

4   '208 patent where this particular impurity is discussed is

5   not limited to particular methodologies.  Because what the

6   Radius inventors also realized was that in order for you to

7   have a formulated drug product that is suitable for

8   administration into a patient, that drug product can only

9   have up to a certain amount of this impurity, or else there

10  are concerns with efficacy and potency.  And the number they

11  registered was maximum 5 percent of this particular impurity

12  and in other embodiments even down to .5 percent.

13       And that leads me to the four patents that are at issue

14  here that are on your Slide 8.

15       So again, the first three patents that we talked about

16  in the very beginning are directed to the storage-stable

17  abaloparatide compositions, those that can be used in that

18  type of pen and maintain their stability for a period of

19  time, as well as methods of treatment using those

20  compositions.

21       The last patent, the '208 patent, is directed to the

22  beta-Asp10 impurity and again describes not only methods of

23  detecting beta-Asp10 but also formulated drug products that

24  compromise that sort of maximum acceptable amount of the

25  impurity.

1    So with respect to the three disputed terms that are at

2    issue and turning to the first term, this term is, "wherein

3    the suitability of the formulated abaloparatide drug product

4    for administration to a subject has been established by a

5    method comprising: detecting and quantifying the presence of

6    less than or equal to 5 percent or less than or equal to

7    1 percent beta-Asp10 of the total peptide content in the

8    formulated abaloparatide drug product."

9    Now, this term shows up in claims 14 and 15 of the '208

10   patent that are on Slide 11.

11   And claim 14, as you can see, is directed to a

12   formulated abaloparatide drug product.  And that product has

13   a number of characteristics, but the dispute centers around

14   that second "wherein" clause that's highlighted on Slide 11

15   and specifically the underlying portion of that clause, "a

16   method comprising."

17   Orbicular's position is that this clause should be

18   further limited to a very specific method embodiment that

19   uses an aqueous buffer that has a pH range of between 6 to

20   10 and that it has that pH range prior to mixing with any

21   other additional solvents.

22   Now, none of those words are in the claims themselves,

23   and as the Federal Circuit and this court have repeatedly

24   cautioned, any time you have a proposed construction that

25   has a lot of words in it that are not in the claim, you

1    should be a little bit weary.  And in this case there's

2    absolutely no reason to limit the term this way.

3         But to understand exactly what Obicular is trying to

4    do, if you go back to the description of the methodology

5    that I mentioned that Radius actually used to discover this

6    particular impurity, again there are many, many features and

7    parameters in these methods, and many of them are actually

8    discussed in the specification.  You can use different

9    solutions, a different mobile phases, multiple mobile

10   phases, different types of columns.

11        Orbicular wants to limit the entire patent, including

12   these formulated drug product claims, to a single embodiment

13   focusing on the blue solution, the Mobile Phase 1; that that

14   solution has to have within it an aqueous buffer that has a

15   pH range of 6 to 10, and it has to have that prior to mixing

16   with any other additional mobile phase solvents.

17        So the entire methodology they want limited to that

18   particular use of that particular solvent.

19        And again, importantly, this shows up in a formulated

20   drug product claim.  It's not a method claim.

21        Now, your Honor is well familiar with the case law with

22   respect to claim construction, so I won't belabor the point.

23   But there is a heavy presumption that a term carries its

24   ordinary and customary meaning.  And there are only two

25   exceptions to this rule.  One, where the patentee acts as

1    her own lexicographer; and, two, where the patentee has set

2    out and disavowed the full scope of the claim term either in

3    the specification or in the prosecution history.  And both

4    standards are exacting.  There is a high bar for fining

5    disavowal or lexicography, and that bar is simply not met

6    here.

7         In fact, as Orbicular conceded in their brief, what

8    they're asking for is generally a disfavored approach.  The

9    Federal Circuit disfavors writing in limitations from the

10   specification.  The Federal Circuit won't even do it if the

11   only thing that's disclosed is that single embodiment.  The

12   only way they would do it is if the patentee actually

13   demonstrates a clear intention to limit the claim scope

14   "using words or expressions of manifest exclusion or

15   restriction."  And they can't point to anything like that in

16   the '208 patent.

17        So we start with the claim language.

18        There are three independent claims in the '208 patent.

19   Claim 14, which we just looked at, is directed to a

20   formulated abaloparatide drug product.  It does not have any

21   of the method details that is in Orbicular's construction.

22        Similar language, however, is found in claims 1 and 9

23   of the '208 patent, and those are where the patentee has

24   expressly decided to claim particular methods.

25        I should note, however, that even these methodologies

1    that are claimed are slightly different from what Orbicular

2    is actual trying to impose into claim 14 because these

3    actually talk about different pH ranges.  They are 7 to 9

4    and 7.5 to 8.5.

5            (Reporter interrupts.)

6            MS. WANG:  So the doctrine of claim differentiation

7    tells us that it is improper to take a limitation from one

8    independent claim and import it into another independent

9    claim.  And that makes perfect sense because patents are

10   found to, and they can, claim multiple different inventions.

11       And this is consistent with the specification.  The

12   title of the patent itself tells us that this patent talks

13   about different types of inventions, formulations, as well

14   as methods of testing, storing, modifying, and using same."

15       And this is distinguishable from the cases that

16   Orbicular relies on where patents that have titles and

17   description that are just limited to one invention were

18   found to, in fact, be limited to those in the claims.

19       We don't have that here.  We have a patent that's very

20   clear that it has multiple inventions.

21       And with respect to the each of those categories, the

22   patent is replete -- the specification is replete with

23   descriptions of formulated drug product and formulation

24   embodiments.  And none of these are limited to any

25   particular methods of testing or method features that

1    Orbicular is trying to now impose on claim 14.

2        And even when you get to the descriptions of the

3    methods that are in the specification, including the parts

4    of the specification on Slide 18 that Orbicular relies upon,

5    it's actually not accurate to say that this entire patent is

6    limited to only one method.

7        Because, in fact, if you look at Slide 19, in the same

8    passage that Orbicular relies upon in columns 3 and 4 of the

9    '208 patent, there are actually multiple descriptions of

10   other methods in terms of method pHs, solvents, buffers that

11   are used.

12       So Orbicular relies on what's highlighted in yellow on

13   Slide 19, which is that -- first of all, it says, "In

14   certain embodiments, the pH of the buffer used in a binary

15   eluent is about pH 6 to 10."

16       They then pull from the next sentence, which actually

17   comes from "in certain other embodiments," the rest of their

18   construction, which is that the pH has to be prior to mixing

19   with another solvent.

20       What they ignore is what's highlighted in blue, and

21   again across the entire package but specifically in blue, in

22   other embodiments that pH refers to the entire solution

23   phase, which includes the combination of solvents.  So

24   certainly not prior to mixing with additional solvents.

25       And they provide no explanation as to why they've

1    cherry-picked essentially these two parts from two different

2    embodiments within the specification to now read into claim

3    14.

4        Left with this intrinsic evidence, they now turn to the

5    prosecution history.

6        And on Slide 21 you can see the relevant prosecution

7    history that's been laid out in the parties' briefing.  But

8    the critical point from this slide is that the claims that

9    became claims 14 and 15, the formulated drug product claims,

10    were not added until February of 2021.  And the reason

11    that's important is Orbicular relies heavily on statements

12    that were made to the Patent Office in December of 2020.

13        Now, again, that has a number of flaws with it.  First,

14    the fact that those statements had nothing to do with the

15    pending formulated drug product claims because they didn't

16    exist at the time.  All of the claims in December of 2020

17    were directed to methods, and they were directed to specific

18    methods, again because the patentee correctly identified

19    that there were certain methods they could claim.  And when

20    they limited their remarks in 2020 regarding the -- when

21    they discussed their remarks in 2020 discussing the prior

22    art, they repeatedly referenced those methods "as claimed."

23        There's no identification in the record anywhere that

24    the applicants intended to extend these statements about the

25    prior art relating to those pending method claims to claims

1    that did not even exist at that time.

2    In contrast, when the new drug product claims were

3    added in February of 2021, those formulated drug product

4    claims that ultimately became claims 14 and 15, the

5    applicants were crystal clear.  In the February 2021

6    remarks, they stated repeatedly that, "following an examiner

7    interview" they had chosen to narrow their invention in this

8    patent, what they're claiming, being two buckets of claims.

9    First, methods for detecting beta-Asp10; and, second, and

10   the use of that "or" is really important here, drug products

11   that contain less than that requisite amount of beta-Asp10.

12   And the applicants noted that those claims relate again

13   to the suitability of the formulation -- the formulated drug

14   product, as opposed to any particular method that's used to

15   detect beta-Asp10.

16   In fact, in March of 2021 when the examiner actually

17   issued the Notice of Allowance, the examiner actually put in

18   an amendment at the very end where the examiner took this

19   exact term that's at issue and moved it from a dependent

20   claim into the independent claim.

21   And when the examiner was doing this, looking right at

22   these words, the examiner did not write in any additional

23   limitations relating to pH or acqueous buffers or any of

24   that, even though that language was perfectly accessible to

25   the examiner.

1        Instead, what we got was the exact language that's in

2   this term, which is, "a method comprising."  That is all

3   that this term requires.  That is the plain and ordinary

4   meaning of this particular term, and there is no basis in

5   the intrinsic evidence or otherwise to limit it to any other

6   features of the methods as Orbicular is trying to do.

7        And with that I'll reserve, unless your Honor has any

8   question, the rest of my time for rebuttal.

9             THE COURT:  No.  The slides were very helpful.

10            MS. WANG:  Thank you.

11            THE COURT:  Do you want to go claim by claim or

12   side by side?

13            MR. POLLACK:  I'm happy to do whatever your Honor

14   prefers.  I'm happy to give my presentation of this term,

15   or, if you would like to do all three first, I'll do

16   whatever your Honor prefers.

17            THE COURT:  I think we had planned to do all three,

18   so maybe we'll just --

19            MS. WANG:  We're actually fine with term by term.

20            THE COURT:  All right.

21            MR. POLLACK:  It will require me to switch out the

22   hardware, if that's okay.

23        (Pause in proceedings.)

24            MR. POLLACK:  Good afternoon, your Honor.  As I

25   think you heard before, my name is Alan Pollack of the

1    Windels Marx firm, and I will be presenting the claim

2    construction positions of the defendant, Orbicular, this

3    afternoon.

4        Collectively I think my time would run under 30

5    minutes, but we will break it up however your Honor prefers.

6            THE COURT:  We're not going to hold you exactly to

7    the 30 minutes.

8            MR. POLLACK:  Well, your Honor's welcome to ask any

9    questions at any time, of course, as well.

10       I will refer to both plaintiffs as just "Radius."

11   There's actually Radius and Ipsen, I understand that, but

12   for convenience I'll just call them "Radius" collectively.

13       There are three disputed terms, as we've already

14   established over here.  We have those three terms shown

15   together here.  I'll first present just the first term,

16   which -- I'll call it the detecting and quantifying term.

17   And as you heard, the Court has already heard, that appears

18   in claim 14 and 15 of the '208 patent.

19       And the constructions are on the screen here in the top

20   row.  And, of course, the Radius construction is simply a

21   plain and ordinary meaning.  Our construction has more

22   detail.  They're, of course, not pleased with the amount of

23   detail that's there, and I will respond to some of the bases

24   for that as well.

25       Let me skip forward to the rest of that.

1          The next slide just -- it's not specific to that term

2     only, but it does set forth the landscape of the four

3     patents that are in dispute.

4          And as your Honor has already heard, there are four

5     separate patents in suit.  Collectively, 91 claims have been

6     asserted against us at this time.  And although we're only

7     presenting three terms, which in my experience is rather

8     surprising given the high numbers of claims here, all of the

9     terms that we will be talking about are shown on this slide

10    together with the application and the patents from which

11    they come.

12         I did want to note also there is a fourth set of claim

13    terms which we've called the "pharmacokinetic terms."

14    That's shown at the bottom right of this slide.  They all

15    come from the re-examination of the '444 patent.

16         We will not be saying much about them today because the

17    only dispute about them is whether they are indefinite, and

18    your Honor has already told us that indefiniteness will be

19    decided at a later time.  So I don't intend to say much

20    about that now.

21         There is an indefiniteness issue with one of the other

22    terms, but I'll get to that when we address that term

23    directly.

24         And the term that I'll talk about now is, indeed, the

25    detection and quantification term that Radius' counsel has

1   also discussed.  The proffered constructions of both parties

2   are shown on this slide here which your Honor has already

3   seen.

4        But before we get to the issue of whether it's

5   appropriate to write in limitations that we propose, we

6   understand the Radius people are quite displeased with that,

7   and I understand that, I think there is a more fundamental

8   issue that needs to be resolved.  And it's not resolved by

9   simply saying "plain and ordinary meaning."

10       That more fundamental dispute is does this claim

11  limitation have any method requirement at all?  Not

12  necessarily the specific one that we have suggested, but

13  does it have a method, some method, any method, required at

14  all?

15       Because I was quite confused reading their briefing.  I

16  don't know what their position on that is.  If you look at

17  the two excerpts from their brief on the left of Slide 6,

18  those excerpts suggest to me that they think this claim,

19  despite the fact that the word "method" appears in the

20  middle of it, they think it has no method requirement

21  whatsoever; not just the specific method that we suggest,

22  but any method.

23       And we've also heard this morning from Radius' counsel

24  about some supposed important difference between the fact

25  that they have method claims and formulation claims.

1        This, of course, is indeed a formulation claim, but it

2   has in the middle of it the word "method."  And that's shown

3   right here.

4        They did cite some law that said that

5   product-by-process limitation shouldn't be imported into a

6   product claim or a composition claim without some good

7   reason to do that.

8        Well, the fact that they wrote in the words "has been

9   established by a method comprising:  Detecting, and

10  quantifying"... that's a pretty good reason to think that

11  there should be some method required here.

12       We can differ on whether it should be the specific

13  method that we've suggested, and I do have some reasons for

14  that I'll go over in a minute.

15       Before we do that, I think it's important to establish

16  that this claim does indeed have some method requirement.

17  You can't just ignore that.  You can't leave that language

18  out.

19       They have accused us of a serious claim construction

20  infraction; writing in when you're not supposed to.  They've

21  pointed at case law we're all familiar with that the Federal

22  Circuit disfavors that.  They cited our brief.  We certainly

23  agree with that.

24       Nevertheless, there are occasions in which we do write

25  in from the specification if the intrinsic record supports

1    that.  It's our position it does.  But that's arguable.  I

2    agree with that.

3        But what should not be arguable and what should be

4    beyond dispute is that this claim does require some type of

5    method.  And the fact that it appears in a formulation claim

6    doesn't discount that.  Because if that is their position --

7    and I'm frankly not quite sure it is because I can't tell

8    from their briefing, and that's why we were very unhappy

9    with simply having heard from them, "plain and ordinary

10   meaning."  We don't know what they mean by "plain and

11   ordinary meaning."  Do they mean there's no method

12   requirement at all here?  I'm still not sure, and I've read

13   their briefs many time.

14       But if it is their position that there's no method

15   requirement whatsoever in this claim, despite the fact that

16   the words "method comprising" appear in the middle of it,

17   well, that's a far worse infraction of what they're accusing

18   us of.

19       They're accusing us of writing in when we shouldn't.

20   But if that is their position, and again I'm not quite sure

21   it is, but if it is, they are doing something far worse,

22   they're taking language out.  They're just ignoring that.

23           THE COURT:  I do not mean to speak for the

24   plaintiffs in the case.  But I think in response to your

25   question, I think what they might say is that, As we see it,

1   the relevant claims are really not directed to a method of

2   the detecting and quantifying the Asp10; that, right, there

3   are claims directed to a drug formulation, which includes

4   specific levels of Asp10.

5      In other words, I think they might be reading the

6   claims a little bit differently than you are.

7          MR. POLLACK:  Well, I think that would be an

8   erroneous reading of the claims because the words "has been

9   --"

10         THE COURT:  I didn't say they would.  I may be

11  wrong.  I'm just maybe translating for them --

12         MR. POLLACK:  That is what I was trying to find out

13  because I don't know what their position is.  I don't know

14  whether they think because this is a formulation claim that

15  there is no method requirement whatsoever.  And if that's

16  not their position, then there's no real issue here.  But I

17  still don't know that.  And that's one of the reasons why we

18  were not happy and -- we didn't think saying "plain and

19  ordinary meaning" was enough.  It doesn't answer that

20  question.  I don't know.

21     And as I showed in, I think the previous slide -- I

22  will go back.

23     If you look at the two quotes from their briefing on

24  the left here, that, at least from my read of that, is they

25  think there is no method requirement.

1          But if you look at the two quotes that we have on the

2     right, it's not so much that.  It's that they think there

3     isn't a requirement for the specific method that we've

4     suggested.

5          But again, even there you have to be very careful with

6     the words that are being used because the fact that the

7     claim may permit a method is not really the answer to the

8     question that I'm asking.

9          These claims of course are claims that use the word

10    "comprising."  You can see that in the first word in the

11    second line.  So of course they permit anything, any extra

12    thing, because they're comprising claims, so they're

13    open-ended.

14         That's not the real issue.  The issue is, is some

15    method required?  That's the question, and I still don't

16    know the answer.  And I think, given the words that are

17    listed here in this claim that they chose to write, of

18    course how else would you interpret those words?  Any other

19    interpretation you would be writing out words in the claim,

20    which I don't understand the Federal Circuit to have ever

21    blessed; whereas, writing in, again not what we normally do

22    but sometimes we do, the Federal Circuit has sometimes said,

23    good to go with that.  That is okay.

24         And so with that I just want to turn to what the basis

25    for our position is.  You heard some of that already.

1          Our position is that the specification does not really

2     describe an enormous number of different ways to do this.

3     It describes a fairly specific set of criteria that are used

4     to find this impurity and make the formulation without it.

5     And those specific criteria were put into claim 1, which I

6     acknowledge is a method claim.

7          And the bullet points below here lists some of those

8     criteria.  Those are the criteria that we think belong in

9     claim 14 because those are the criteria that they were

10    forced to put into the method claims because the examiner

11    said, no, you have to be more specific, and they did.

12         And that's shown -- I'm sorry.

13         I should point out our construction comes from the

14    specification.  They're perfectly correct about that.  And

15    the part of the specification that it comes from is shown

16    here.  I believe they showed a similar slide.

17         I will also agree that some of the criteria that we are

18    suggesting should be part of this method are not identical

19    to those shown in Claim 1.

20         But, you know, you want to -- you want to take it from

21    claim 1, that works for us, too, although I don't know why

22    they should be upset that we're supposing a construction

23    that is a broader range of pH than specifically claimed

24    here.  We said 6 to 10 because that was the maximum range

25    listed in the spec.  So we gave them the biggest range that

1    they disclosed.  Why that should be a point of contention

2    I'm not quite sure.

3        But, in any event, that is the source of our

4    construction.

5        And we are also relying on the prosecution history,

6    which is shown in part here, the two components of claim 1

7    that they were -- that they added in some of which to get

8    over prior art are shown in the underlined portion of the

9    claim shown here with their discussion about them.

10        And frankly I don't know what the answer to the

11    question is.  If these limitations were required to be added

12    in for patentability by the examiner for this specific

13    claim, which is not the claim we're talking about, I agree

14    with that, why wasn't this criteria added into claim 14, or

15    required to be added into claim 14?

16        THE COURT:  On that issue is there any statement

17    you can point to by the examiner stating that the

18    limitations of claim 1 need necessarily be incorporated into

19    claim 14?

20        MR. POLLACK:  No, I don't believe so.

21        And they are correct to point out that claims 14 and 15

22    came into the patent application very late in the game, in

23    our view, pretty much after the prosecution in chief was

24    pretty much done, and, frankly, I don't have an explanation

25    for why that was.

1          We regard that as an error of the examiner.  Of course

2     they disagree.  Your Honor will decide what is appropriate.

3          That's my piece on that, and I can pass it back to them

4     to talk about the next term if you'd like.

5               THE COURT:  Thank you.

6          Ms. Wang probably wants to correct me.

7               MS. WANG:  Very briefly, your Honor.

8          (Counsel conferred.)

9               MS. WANG:  Radius has never suggested, your Honor,

10    reading any particular terms out of the claim.

11         Our position is that the claim as written means what it

12    says, which is, A formulated abaloparatide drug product

13    comprising less than or equal to 5 percent of this

14    beta-Asp10.  That product then also has an acqueous buffer

15    within it.  That's talking about the actual drug itself,

16    which I don't think is in dispute.

17         Then that product also has these two additional

18    "wherein" clauses.  First, that the formulated drug product

19    has a concentration between 1.8 and 2.2.  Again, not in

20    dispute.  And, second, where the suitability of that drug

21    product for administration into a patient has been

22    established by a method comprising, detecting and

23    quantifying the presence of that less than or equal to

24    5 percent of beta-Asp10.

25         The claim is direct that way.

1         So we're not saying that you can have abaloparatide and

2    simply say, Oh, I assume it's 99 percent pure and,

3    therefore, it definitely has less than 5 percent of

4    beta-Asp10.  That's not what we're saying.

5         You actually have to demonstrate by some method, and it

6    says, "a method comprising, detecting and quantifying" that

7    particular percentage of beta-Asp10.

8         That's how you demonstrate the suitability of the drug

9    product.

10        So we are not reading out any method.  What we're

11   actually trying to do is stay true to the claim language and

12   not do what Orbicular is suggesting, which is now to read in

13   particular parameters of what method you use, to specify

14   that you have to use a method that has a pH buffer, that you

15   have to have a method that has that buffer before you do

16   anything else with it.

17        That's the disputed issue here, is Do we stay true to

18   the term language, the claim language, that just says "a

19   method comprising," or do we read in the extraneous features

20   that Orbicular has tried to introduce?

21        And I believe my brother conceded that there is nothing

22   in the prosecution history, no statements by the examiner,

23   nor any statements by the applicant, that any sort of

24   distinguishing arguments with respect to the then-pending

25   method claims back in 2020 should be extended to apply to

1   the formulated drug product claims that came in 2021.

2       So again, nothing in this case in the intrinsic record

3   suggests that you should import these limitations and go

4   against the full weigh of the Federal Circuit case law that

5   cautions against this approach.  And for that reason I urge

6   your Honor to adopt the plain and ordinary meaning of this

7   term.

8           THE COURT:  I'm trying to understand in a broad

9   sense, from the inventor's point of view, what is the

10  particular value conferred by the detection method?

11          MS. WANG:  So if you're talking about the claims

12  that are not at issue, your Honor.  So there are method

13  claims --

14          THE COURT:  No, I'm interested in the invention

15  itself --

16          MS. WANG:  So there --

17          THE COURT:  -- what the inventor would think was

18  really the great leap forward.

19          MS. WANG:  Yeah.

20      So there are actually -- as I mentioned at the

21  beginning, there were two sort of major leaps, and I think

22  it's really important to think about both.

23      In the first instance, again the discovery of this

24  impurity, which we're talking about a drug that is inserted,

25  as your Honor knows, injected into a patient daily.  And

1    we're talking about a formulated drug product that has to be

2    suitable for that administration.

3        So after the Radius inventors found the impurity --

4    first, there's an innovation here of actually how to find it

5    because it is kind of difficult to find, but also

6    recognizing that there's a certain percentage that you can

7    have in your product that is the maximum acceptable

8    percentage to be suitable.

9        And there's -- in the specification there are

10    descriptions of how the Radius inventors determined that

11    particular percentage and therefore created a formulated

12    drug product that is actually manufactured and determined

13    suitable for administration because of that particular

14    percentage.

15        So those are two separate buckets of innovations.

16        Because again before the Radius inventors knew about

17    that, there were -- nobody knew about the beta-Asp impurity,

18    and so there was a risk that patients were getting

19    abaloparatide that would not have pure -- or, actually,

20    mostly pure abaloparatide.

21        So those are different buckets of innovations, and it's

22    important to remember that it's not just limited to method

23    of detecting.

24            THE COURT:  Thank you.  That's helpful.

25            MS. WANG:  Thank you.

```
1            THE COURT:  We're going to pass the baton to

2    Ms. McGillycuddy, I think.

3            MS. WANG:  Yes.

4            MS. McGILLYCUDDY:  Good afternoon, your Honor.

5    Bryana McGillycuddy from Choate, Hall & Stewart on behalf of

6    plaintiffs.

7        Now, the next term that we're going to construe is

8    shown here on the slide, "said composition does not contain

9    a chemical stabilizer."

10       Now, this is found in dependent claim 13 of the '333

11   patent.  Claim 13 depends from claim 1 of that patent.

12       So claim 1 of the '333 patent is shown here on Slide

13   29.  Claim 1 recites, "A storage-stable composition suitable

14   for administration to a subject"...  And that composition

15   comprises the abaloparatide peptide as well as an effective

16   amount of a pH buffer.

17       Now, the claim that's in dispute here is claim 13,

18   which depends from claim 1.

19       Claim 13 recites that same composition and specifies

20   that "the composition does not contain a chemical

21   stabilizer."

22       Now, the crux of the parties' dispute here doesn't

23   center on the full scope of claim 13, but it focuses on the

24   question of what is meant by the term "chemical stabilizer."

25       Now, Radius' position, your Honor, is quite simple.
```

1    It's that "chemical stabilizer" should be given it's plain

2    and ordinary meaning, which here is informed by the

3    definition of the broader term "stabilizer," to be a

4    "composition which maintains the chemical stability of the

5    peptide."

6        Orbicular, on the other hand, has tried to create

7    confusion here where there really is none.  And it's put

8    forward multiple proposed constructions of what is a

9    chemical stabilizer.  And those two are shown here on Slide

10    29.

11        On the one hand, according to Orbicular's original

12    construction, a chemical stabilizer is a "composition which

13    maintains the chemical, biological or hormonal stability of

14    the peptide," so not limited to chemical.

15        Orbicular has also put forward an alternative

16    construction that a chemical stabilizer is a chemical, not a

17    composition, that imparts any type of stability.

18        THE COURT:  This is a distinction which I think

19    would be very helpful to understand.  I mean, when I look at

20    something like "chemical stabilizer," what comes to my mind,

21    I would say, would be adding sulfite to wine to keep it from

22    oxidizing.  That's my idea of a stabilizer.  But you say,

23    no, you mean something else here.

24        MS. McGILLYCUDDY:  That's correct.  It would be

25    more a gasoline stabilizer, your Honor.  You may be familiar

1    with that.

2         THE COURT:  I used to work in a gas station,

3    actually.

4       (Laughter.)

5         MS. McGILLYCUDDY:  There you go.

6    So a gasoline stabilizer is a product used to stabilize

7    gasoline -- or, excuse me, stabilize a lawnmower for

8    long-term storage.  It is not gasoline that is used to

9    stabilize.

10    And I think if your Honor looks at the next slide,

11    Slide 30, this will help inform this meaning as well.

12    So the guiding evidence here in resolving this dispute

13    in figuring out how does chemical modify stabilizer is the

14    fact that the '333 patent expressly defines the term

15    "stabilizer," the broader term "stabilizer."

16    And it does so by saying "a stabilizer is a composition

17    which maintains the chemical, biological or hormonal

18    stability of the peptide."

19    So a stabilizer generally maintains certain types of

20    peptide stability.  And it separates that out into three

21    categories based on their function.  So you can therefore

22    have a chemical stabilizer that maintains chemical

23    stability; a biological stabilizer that maintains biological

24    stability; and a hormonal stabilizer, which maintains

25    hormonal stability of a peptide.

1          The fact that there are three different types of

2     stabilizers that are subsumed within this broader definition

3     of stabilizer is made clear by the identification of those

4     three types of stability in the specification, and the fact

5     that the definition uses the word "or," which lists them out

6     in the alternative, showing that they have independent

7     meaning and are not intended to be grouped together as one,

8     which is what Orbicular is trying to do here.

9          Now, as mentioned at the outset, Orbicular has put

10    forward multiple proposed constructions of "chemical

11    stabilizer."  And, to be honest, it's not clear which one

12    they're going with.  Are they going with a composition that

13    maintains chemical, biological or hormonal stability?  Are

14    they going with a chemical that imparts any of that

15    stability?  But no matter what, Orbicular's constructions are

16    contrary to the intrinsic evidence.

17         And Slide 33 here shows Orbicular's construction of

18    chemical stabilizer in the context of that broader defined

19    term stabilizer.

20         So if Orbicular construes chemical stabilizer as a

21    chemical which maintains the chemical, biological or

22    hormonal stability of the peptide, which is shown next to

23    number one here on Slide 33, that's directly contrary to the

24    intrinsic evidence, which I'll walk through next.

25         But you'll see in the intrinsic evidence the only

1    instances that "stability" and "stabilizer" are modified by

2    the term "chemical" is in reference to its function, the

3    assessment of the chemical stability of the peptide, which

4    in this case, as the specification makes clear, is the

5    ability of the peptide to maintain its chemical structure

6    over time.

7         So that's what we're talking about when we talk about a

8    "chemical stabilizer," something that is helping the peptide

9    maintain its chemical structure and prevent against

10   degradation.

11        There's not a single reference in the specification or

12   anything else that Orbicular points to that says we're

13   talking about a chemical that stabilizes more broadly, not a

14   single reference.

15        Now, on the other hand, if Orbicular is construing

16   "chemical stabilizer" as is shown next to this number 2

17   here, as "a composition which maintains the chemical,

18   biological or hormonal stability of the peptide," Orbicular

19   is effectively writing the definition of stabilizer to be

20   the same as a chemical stabilizer.  They're changing the

21   defined term.  They would effectively nullify the defined

22   term "stabilizer" by doing this.

23        If the patentee intended to define "chemical

24   stabilizer" instead of "stabilizer," it could and would have

25   done that.  It did not.

1         Now, as your Honor is well aware, the Federal Circuit

2    has made clear that specification definitions must control.

3         Here the inventors expressly defined the broader term

4    "stabilizer."

5         Orbicular cannot now rewrite that to be a different

6    definition of the term "chemical stabilizer."

7         Now, I submit, your Honor, that the analysis could

8    begin and end with the specification definition of the

9    broader term and how it's clear that the defined term

10   "stabilizer" tells us that the narrower term "chemical

11   stabilizer" is referencing chemical stability, its function.

12        But the intrinsic evidence confirms that that's what's

13   meant here.

14        First, there's only a few references to "chemical

15   stability" or "chemical stabilizer" throughout the

16   specification.

17        The first is the specification definition that we just

18   discussed.

19        The second is when the specification evaluates chemical

20   stability, again measured by percentage peptide remaining

21   over time.

22        It's clear, as shown on Slide 34 here, that when saying

23   "chemical stability" and "chemical stabilizer," what the

24   inventors were talking about was the function of maintaining

25   the peptide chemically.  They're assessing the chemical

1      stability of the peptide over time.  They're not talking

2      about a chemical that stabilizes, and they're not talking

3      about stability more generally.

4          On the right-hand side of Slide 34, the specification

5      provides a list of exemplary stabilizing agents immediately

6      following the definition of "stabilizer."  And Orbicular

7      would have stabilizing agents be limited to chemicals.

8          But that's not true.  This list of stabilizing agents

9      includes proteins, and that's shown here on Slide 34 where

10     the specification says, "proteins, such as, albumin."

11         It's clear at the end of the day no matter how you read

12     the specification or the file history that when the

13     inventors were talking about chemical stabilizers they were

14     talking about chemical stabilizers in their function in

15     maintaining the chemical stability of the peptide over time.

16     They were not talking about chemicals.

17         Now, the next argument that Orbicular makes here is

18     that the specification conflates "stabilizer" and "chemical

19     stabilizer."  And they make that -- they manufacture that

20     conflation to support their construction that a chemical

21     stabilizer should be defined to be the same thing as a

22     stabilizer.

23         First, it's important to note that Orbicular has not

24     provided any evidence to support this argument, no expert

25     declaration, nothing.  It's just attorney argument, how --

1    excuse me, how Orbicular's attorneys interpret the

2    specification.

3        Second, the intrinsic evidence makes clear that the

4    inventors did not conflate stabilizer and chemical

5    stabilizer to mean the same thing.  The references to

6    chemical stabilizer clearly refer to chemical stability.

7        Now, Example 1 of the patent, which is shown here on

8    Slide 35, is an evaluation of chemical stability.  And in

9    this example the inventors show that you can have a stable

10   formulation without having a chemical stabilizer.

11       And Orbicular points to the description of this

12   example, which is shown in the first callout box on the

13   right, and says -- Radius says here, "excellent chemical

14   stability," and the "solution contains no stabilizer."

15       Clearly, according to Orbicular, "chemical stability"

16   and "stability" and "chemical stabilizer" and "stabilizer"

17   must be the same thing.  But the context makes clear here,

18   your Honor, that it's referencing a chemical stabilizer in

19   the context of chemical stability.  This entire example, an

20   evaluation, is of chemical stability.

21       And if there were any doubt, which there's not, the

22   description of Figure 1, which is what's being evaluated in

23   Example 1 in the specification, makes clear that the no

24   stabilizer being referenced there is no chemical stabilizer.

25       It's clear from the specification and the examples that

1    the inventors intended to separate out different types of

2    stability and different types of stabilizers based on their

3    function.

4         Example 1 is referencing chemical stability and

5    chemical stabilizers.

6         Example 4 later in the patent refers to biological

7    stability in evaluating the effectiveness of preservatives.

8    There's no mention of chemical stabilizers or chemical

9    stability there.  That's a biological stability assessment.

10   There's a clear delineation.

11        Now, lastly, Orbicular contends that the purpose of the

12   invention is a stable composition with respect to all types

13   of stability.  And in Orbicular's view, for this reason, all

14   references to chemical stability and chemical stabilizer

15   must be referring to all types of stability and not just

16   chemical stability.

17        And Orbicular's correct that the aim of the patent is

18   to achieve compositions that are storage stable.  But here

19   the claim language of dependent claim 13 governs, and claim

20   13 discusses a narrower form of stability, a chemical

21   stabilizer.  And just because the recited purpose of the

22   invention doesn't further break it down to chemically

23   stable, biologically stable, hormonally stable, doesn't mean

24   that claim 13 should be broadened out to cover all types of

25   stability.

1          And beyond that, Orbicular misunderstands the concept

2     of stability and the purpose of stability, and that's shown

3     in Example 1 here, which shows that you can have a stable

4     formulation without a chemical stabilizer.

5          Now, based on the claim language and the intrinsic

6     evidence, it's clear that the defined term "stabilizer" is a

7     broad term covering multiple categories or types of

8     stabilizers.  "Chemical stabilizer" is one type of

9     stabilizer that maintains the chemical stability of the

10    peptide, and for that reason, your Honor, we ask that you

11    adopt Radius' proposed construction.

12          THE COURT:  Thank you.

13    Mr. Pollack.

14          MR. POLLACK:  Thank you, your Honor.

15          Now we'll address the second term, the chemical

16    stability term.

17          And this is, in our view -- it boils down to

18    essentially a dispute about whether chemical stability means

19    a chemical that stabilizes, which is essentially what we

20    say, or whether it means a stabilizer that provides only a

21    very specific type of stability, and that's what we just

22    heard Radius insist this claim term means.

23          But before we get to that, I think it's important to

24    recognize one fact about indefiniteness.  Again, I don't ask

25    the Court decide anything about indefiniteness now, but we

1    insist that claim 13 is indefinite, and we believe the basis

2    for that and our reasons for that do have a bearing on a

3    proper claim construction, to the extent we can have one.

4        And the basis of that is really quite simple.  If we

5    look -- the point of all of these patents, as we understand

6    it, is to make a compound, which had been around for a

7    while, the abaloparatide compound, in a stable formulation

8    because alone it was not stable enough to use in the way

9    that people wanted to use it.

10       So if we look at claim 1, which is a very simple claim,

11   it has only two limitations, and the preamble says that the

12   formulation you end up with is a storage-stable composition.

13       The first part of that claim, a), the one that's boxed

14   in red, is the abaloparatide compound, which we know is not

15   already stable.

16       So if we end up with a storage-stable composition, the

17   only other thing in this claim that can provide that

18   stability is Element b), which is the buffer.  But the

19   buffer is also a chemical, and that to me means that the

20   buffer must be a chemical stabilizer.

21       But if we go to claim 13, which incorporates all the

22   limitations of claim 1, it says you can't have a chemical

23   stabilizer.

24       So how can we have a buffer?  We don't think that

25   conflict is something that can be resolved, but we're not

```
1    asking the Court to look into that now, but it does bear on

2    how we decide what the term "chemical stabilizer" means.

3         Because at the end of the day this doesn't make any

4    sense.  So for them to suggest that something is wrong or

5    off about what we're saying, I think there's a more

6    fundamental problem, which is this patent, or at least claim

7    13, doesn't make any sense because of how they use these

8    terms.  And that's partly the basis for why our

9    construction, we believe, is the preferred one, to the

10   extent there can be one here.

11        The point of this patent, as I think we already heard

12   from Radius counsel, is to have a stable composition

13   overall.  Whether we parse that type of stability into three

14   different components or not, the point is to have an overall

15   stable compound.  But if we look at the intrinsic record

16   here, first at the specification, we do not find the type of

17   specificity that we believe Radius is improperly trying to

18   inject into this claim under the guise of suggesting that

19   it's the plain meaning.

20        If we look at how -- first of all, the term "chemical

21   stability, chemical stabilizer" never defined anywhere in

22   the spec.  The purported definition that they point to is a

23   general definition of "stabilizer" that's shown on the left

24   side of this slide.

25        And if we look at Figure 1, that purports to show the
```

1    stability of the product by measuring the amount of the

2    abaloparatide compound that remains in its original form

3    after the passage of a particular amount of time.  That's

4    called here "percent peptide remaining."

5        When they use the word "peptide," I think we can all

6    agree we're talking about the abaloparatide peptide.  So

7    that's what -- we're measuring how much of the original

8    stuff is still there after a certain amount of time.  The

9    more of the original stuff that's there the better.  That

10   means we have a more stable formulation.  So far, so good.

11       And if we look at the description of Figure 1, we see

12   the one time the term "chemical stabilizer" is mentioned

13   outside of the claims.  That's all fine.

14       But if we go to something like Table 6, which has a

15   very similar sort of data set, although it's characterized a

16   bit differently -- these are the two things that are boxed

17   in the green on this slide -- it says, Percent initial

18   concentration at time T equals zero.

19       That might be a little confusing, but it's basically

20   the same thing as percent peptide remaining, how much of the

21   original stuff is still there?

22       And here we're measuring a different version of it with

23   something called phenol.

24       Phenol is an antimicrobial.  That's described in the

25   center of this slide from a portion of the specification.

1    And although they don't use the words "biologically stable"

2    here, if we have to pick among the three types of stability,

3    phenol would fall into the biological stability category.

4    But yet it's doing the exact same thing that we saw in

5    Figure 1.  It's preserving the peptide in exactly the same

6    way.  So I'm not sure where we get this difference between

7    the two or why that difference really matters.

8        And I think this is most clear from a comparison

9    between the specification of the '770 patent and the '333

10   patent.

11       If we could just go back to this slide, which I showed

12   originally, you can see how the '770 is related to the '333.

13   They both originate from the PCT from 2007, and the '770

14   issued a bit earlier than the '333, but they're all

15   genealogically related.

16       And if we look at the '770 specification, some words

17   appear there that are different than in the '333.  And

18   highlighted sentence says, referring to the compositions of

19   the invention, "These compositions eliminate the need for

20   chemical stabilizers and other stabilization techniques,

21   such as, lyophilization."

22       Now, what this sentence tells us is that the term

23   "chemical stabilizers" was used by them to distinguish

24   providing the stability by adding something like a chemical

25   as opposed to providing stability by performing a process, a

1    process like lyophilization.

2        By the way, "lyophilization" is just a fancy science

3    word for freeze drying.  Basically it's another way to make

4    something more stable.  But it's different than adding a

5    chemical or adding something.

6        And I think that's what the term "chemical stabilizer"

7    was used to mean here.  It was used to distinguish adding

8    stuff into the formulation from doing something to the

9    formulation.

10        That's what the term "chemical stabilizer" should mean,

11    and that supports our construction and why our construction

12    is the proper plain meaning construction, at least with the

13    specification that we have.

14        And there is no response to this.  I didn't hear

15    anything from them about this at all.  This was in our

16    brief, our responsive brief.  They obviously wouldn't have

17    had a chance to comment about this in their responsive brief

18    because they were simultaneous.  But they got that brief, I

19    don't know, a long time ago, and I didn't hear anything

20    about that today.

21        So we think this is perhaps the most persuasive

22    intrinsic evidence why we're correct to the extent that this

23    claim can have some sort of a meaning, but, as I said in the

24    beginning, we don't think there's really a lot of meaning to

25    be had because we think it's inconsistent with claim 1.

1    And, of course, we've heard some additional discussions

2    here this afternoon about overall drugs.  The point of the

3    patent is to be stable overall, not to have only a very

4    specific type of stability.  We're not looking for a

5    formulation that might be hormonally or biologically stable

6    but not chemically stable.  There's no point in that.

7    There's no point in parsing stability in the way that

8    they're suggesting to do it here.  It just doesn't make any

9    sense.  The overall point was stability of all types, not

10   stability of one specific type.

11       And I think that's all I have for that term.

12           THE COURT:  Thank you.  I understand.

13       The third term.  Ms. McGillycuddy, you are going to

14   have to explain to me what the actual difference is --

15           MS. McGILLYCUDDY:  Yes.

16           THE COURT:  -- with respect to this claim.

17           MS. McGILLYCUDDY:  If I may briefly be heard in

18   response to my brother counsel on rebuttal for "chemical

19   stabilizer"?

20           THE COURT:  Yes.  Go ahead.

21           MS. McGILLYCUDDY:  Thank you very much.  I promise

22   to be brief, your Honor.

23       Your Honor, rather than being supported by the claim

24   language or the intrinsic record, all we heard was attorney

25   argument.  Orbicular's again manufacturing confusion here

1    where none existed, and I would like to start with my

2    brother counsel's reference to the '770 patent because he

3    said I didn't mention it in my openings argument.  And,

4    quite frankly, your Honor, I didn't mention it because it

5    doesn't further their construction.

6        They point to the '770 patent, a different patent in

7    this family, and say that it distinguishes chemical

8    stabilizers from other stabilization techniques.  But as

9    shown here on Slide 48, lyophilization is a method for a

10   process that can increase the stability of the peptide.

11   That is distinct from an agent, such as a chemical

12   stabilizer, that can be added to the composition to maintain

13   its stability.

14       Now, just because Radius distinguished in the '770

15   patent processes such as lyophilization from chemical

16   stabilizers, those agents that can be added, does not mean

17   that Radius was conflating chemical stabilizer with all

18   types of stability or saying that chemical stabilizer must

19   be a chemical.  Instead, it was just distinguishing

20   processes from agents.

21       So again, their reference to the '770 patent and this

22   lyophilization discussion does nothing to advance their

23   argument.

24       My brother counsel also mentioned the inclusion of the

25   antimicrobial agent phenol and said that because phenol

1    increased the chemical stability of the formulation that was

2    being evaluated in Table 6 in comparison to Example 1,

3    phenol must be a chemical stabilizer.  Again, we're just

4    hearing attorney argument here.  There's no evidence.

5        What my brother counsel failed to mention is that the

6    parameters, the formulation components of the target of

7    Example 1, were different from the target of the Table 6

8    formulation.  The concentration of abaloparatide differed

9    meaningfully.  There was only .1 mg per ml of abaloparatide

10   in one formulation; when there was 2 mg per ml in another

11   formulation.

12       So it's comparing apples and oranges.  You can't look

13   at one formulation that's entirely different from another

14   formulation and say, because that other formulation was more

15   stable and included phenol, that phenol must be a chemical

16   stabilizer.  There's no conclusion that can be drawn there.

17       And lastly, your Honor, I would like to briefly address

18   my brother counsel's indefiniteness argument.  And I would

19   just like to note for the record that the indefiniteness

20   argument of claim 13, or the issue of indefiniteness,

21   rather, was raised for the first time in Orbicular's opening

22   brief.  It was never mentioned during conferrals or the

23   joint claim construction statement; but nevertheless, so the

24   record's clear, we'll respond to it here.

25       The indefiniteness argument is that the buffer of claim

1    1 must be the same thing as a chemical stabilizer because

2    the buffer is the only thing that imparts stability on

3    claim 1.

4         Again, this is all attorney argument.  There is no

5    conflation in the patent of the term storage-stable and

6    chemical stabilizer.  We're talking about two different

7    things here.

8         And it's important to note that Orbicular's problem

9    that it's created here, this manufactured indefiniteness

10   problem, is by taking the term "stabilizer" and conflating

11   it with "chemical stabilizer."  There's just no support for

12   that.

13        The intrinsic record makes clear that claim 13's

14   recitation of "does not contain a chemical stabilizer" is

15   exclusive of the buffer.

16        If you look at Slide 47 shown here, you can see that

17   the specification treats buffers and stabilizers as two

18   separate things.

19        First, we have a description of pharmaceutically

20   acceptable excipients, and that says they may include

21   buffers on the one hand and, among other things,

22   stabilizers.  Two separate things.

23        The excerpt pulled from Example 1, which is shown in

24   the second box here, says that you can have a solution that

25   contains no stabilizer and only 6 millimolars acetate

1    buffer.

2        So it's quite clear that the inventors viewed the

3    buffer of claim 1 to be distinct from the chemical

4    stabilizer of claim 13.

5        And the doctrine of claim differentiation also applies

6    here.  As your Honor is aware, there is a presumed

7    difference in meaning and scope when different terms are

8    used.  Claim 1 uses a pH buffer.  That has a distinct

9    meaning within the specification.

10       Claim 13 uses chemical stabilizer that must have, under

11   claim differentiation, a different meaning and scope.  And

12   it does, is a narrow type of stabilizer that is added to the

13   formulation.

14       There's simply no conflation of buffer and chemical

15   stabilizer throughout the specification, and this confusion

16   or, you know, inability to correlate claim 1 with claim 13

17   that my brother counsel mentioned, is purely of their own

18   makings.

19       In closing, Orbicular has not pointed to a single

20   reference in the specification or file history to support

21   its construction that a chemical stabilizer must be a

22   chemical that stabilizes things more broadly.

23       Radius' simple proposed construction which is grounded

24   in the specification definition of the broader term

25   stabilizer should apply.

1          Thank you, your Honor.

2          THE COURT:  All right, "bone fracture."

3          MR. POLLACK:  Your Honor, could I just briefly

4  comment on a few things that she just said?

5          THE COURT:  Yes.

6      We don't have to switch equipment, do we?

7          MR. POLLACK:  No, no. no.

8      Very briefly, I just want to touch on a handful of

9  things she mentioned.

10     She mentioned something about being unfairly surprised

11 or, I don't know, waiver or something about the

12 indefiniteness argument for this particular claim term.

13     I really don't understand that point at all.

14         THE COURT:  Well, judging from how polished her

15 response was, I don't think she was that surprised.

16     (Laughter.)

17         MR. POLLACK:  Yes.  I don't think so either.

18     But I find their position a bit odd, in that they are

19 the party that seemed to be very eager to have

20 indefiniteness rolled over for a dispute for another day.

21 And of course your Honor decided that that would happen.  So

22 the fact that we introduced this, in their view, late, when

23 we're not going to be deciding this issue until, I don't

24 know, some future time, I'm not sure how this causes any

25 problem.  So that's a bit of a mystery to me.

1    Second, I just want to point out that I believe our

2    logic in comparing claim 1 to claim 13 is simply

3    unassailable.  I don't understand how they can avoid that.

4    But indefiniteness is an issue for another day.

5    I also want to push back a bit on their criticism that

6    our presentation as being attorney argument.  I mean, I

7    don't see an expert here on their behalf either.  They

8    didn't submit an expert declaration about anything.  We

9    certainly did rely on parts of the intrinsic record.  So I

10   don't think that's a fair characterization of our

11   presentation.

12           THE COURT:  All right.

13           MS. McGILLYCUDDY:  Hello again, your Honor.

14   So we are on to the third and final term, which is

15   "said subject has a bone fracture."

16           THE COURT:  This seems the kind of argument that

17   Thomas Aquinas would have loved.

18       (Laughter.)

19           MS. McGILLYCUDDY:  Excuse me, your Honor?

20           THE COURT:  This is the kind of differentiation

21   that Thomas Aquinas would have delighted in, parsing the

22   difference between these two constructions.

23           MS. McGILLYCUDDY:  To be honest, your Honor, the

24   dispute between the parties isn't entirely clear to Radius

25   either.

 1          It's Radius' position that the term "has a bone

 2    fracture" is quite straightforward.  It's a well-understood

 3    term, and its plain and ordinary meaning should apply.  In

 4    our view, no further construction is necessary, but

 5    Orbicular has added 15 words, which are shown in red here in

 6    the gray box on Slide 39 that really muck up the meaning of

 7    this term, and it's unclear to us what exactly they're

 8    advancing here by saying, "when administration started"...

 9    and ..."does not include a break that occurs after

10    administration is started."

11          And it's important, your Honor, to put dependent

12    claim 8 in the context of claim 1 from which it depends.  So

13    claim 1 recites, A method of stimulating bone growth...

14    comprising administering to a said subject a composition

15    that has abaloparatide and a buffer.

16          Claim 8 says that the subject must have a bone

17    fracture.  The subject has a bone fracture when being

18    administered that composition.

19          And the guiding principle of this term is one we've

20    already discussed at length today.  So I'll only touch upon

21    it briefly.  But it's that the Federal Circuit has made

22    clear that unless the patentee has acted as his or her own

23    lexicographer and defined a term or otherwise expressly

24    disclaimed claim scope, the plain and ordinary meaning

25    should govern.

1        This is particularly true, as we have been instructed

2    by *Phillips*, with commonly understood words.  If a word can

3    be understood by a layperson, then claim construction just

4    involves the widely accepted meaning of that term being

5    imparted.

6        Here, the plain meaning of "has" is clear not only to a

7    person of skill in the art but to any layperson.  "Has" is

8    well understood to have present tense meaning.

9        And Orbicular doesn't appear to dispute that "has" has

10   a present tense meaning, but they have added a bunch of

11   words that appear to change the meaning of this term "has"

12   and make it "had."

13       Now, in the context of claim 1, "has a bone fracture"

14   is just that a subject has a bone fracture when being

15   administered.  There's no further temporal limitations.

16   That's true of the specification as well.

17       The only reference to this term "bone fracture" in the

18   specification is shown here on Slide 41 where it says that

19   these compositions are "useful in the treatment of diseases

20   or disorders associated with deficiency in bone growth such

21   as osteoporosis and bone fractures."

22       There's no point in the specification where the timing

23   of the bone fracture is limited; no point in the

24   specification that says the bone fracture must be present

25   before and not after administration.

1        And Orbicular's moving away from the plain meaning of

2    "has" and confusingly adds these 15 words to a simple and

3    straightforward term.

4        And it's particularly problematic here because the '382

5    patent teaches administration of abaloparatide as a single

6    dose or multiple doses over time.

7        And I have shown here on Slide 43 what the teaching of

8    the patent is.  So the plain and ordinary meaning of "has a

9    bone fracture," in view of this teaching and the language of

10   claim 1, is that the subject has a bone fracture at any

11   point during the course of administration.  That could be

12   the administration of the first dose, or that could be the

13   administration of the eighth dose.

14       But Orbicular is introducing complexity into this

15   simple term.  And it appears to us, your Honor, that the

16   defendant is attempting to improperly narrow claim 8.  And

17   they're trying to say that the bone fracture can only be

18   present at the first administration in a course of treatment

19   and not thereafter.

20       And Slide 44 shows the impact of this type of

21   construction.  Under the claim language, a subject who

22   develops a bone fracture while being administered

23   abaloparatide, regardless of what dose number it is, will

24   fall within the plain and ordinary meaning.

25       Orbicular, on the other hand, has arbitrarily decided

1     that the subject can only have a bone fracture when the

2     administration started.  And that's shown in the red arrow

3     here.  Anything after the red arrow would fall outside the

4     scope of claim 8 according to Orbicular's construction.

5         And this is improper because it's moving away from the

6     claim term "has" from its present tense, and for every dose

7     after the first administration it's turning it into "had."

8         Your Honor, Radius' construction of plain and ordinary

9     meaning is straightforward and simple.  It's that the word

10    "has" means what it says, that the subject has a bone

11    fracture when being administered.  There's no reason, in the

12    specification or otherwise, to add 15 additional confusing

13    words to this claim term.

14        And for that reason, unless your Honor has any further

15    questions, I will cede the podium.

16            THE COURT:  As I understand it, what you are saying

17    is that, yes, there has to be a bone fracture, but if there

18    is a series of dosages, it just has to be present during one

19    of those administrations.

20            MS. McGILLYCUDDY:  That's correct, your Honor.

21            THE COURT:  Okay.  I followed you then.

22            MS. McGILLYCUDDY:  Thank you.

23            MR. POLLACK:  I will be very brief.

24        I don't think there's an enormous dispute about this

25    term.  It's clearly the simplest one I think we're

1    discussing today.

2        Basically, our position is that our construction is the

3    plain meaning, not that we're displacing it.  And we want it

4    to be very clear.  Because one of the concerns I had with

5    their construction is I don't now where their yellow arrow

6    ended.

7        If you look at their Slide 44, there was a yellow

8    arrow.  I don't know where that ends.  I don't know when the

9    administration of the drug is considered to end, which was

10    why we put in the words that we did to try and make clear

11    what is meant by "has" in the present tense.  That was the

12    only reason we did that.  Because this drug is administered

13    in a continual way for some period of time.  I don't know

14    when they consider the administration to end.

15        Does it end within a day after the last dosage is

16    given?  Does it end within an hour, a year?  I mean, that,

17    to me, is an avenue for confusion.

18        So that was the basis for our construction, which comes

19    from the dictionary.  And I think we probably do agree with

20    Radius' counsel that "has" has a very clear meaning to all

21    of us.  We all speak English.  We don't need to consult an

22    expert on that.  We can go to any dictionary and find that

23    out.  And that what's our construction was intended to do.

24    And also to point out that relying on the doctrine of claim

25    differentiation, as they've mentioned a few times, if there

1    isn't a temporal limitation in the way that we suggest, we

2    don't think there's as much of a meaningful distinction

3    between claim 1 and claim 8 as there really should be.

4        What I heard today I think was a little different than

5    what we saw in their briefing.

6        In their briefing they said there was no temporal

7    limitation at all.  Now, that one I'll push back on petty

8    hard.  But I think our construction is the better plain

9    meaning, and the basis of it is the ordinary meaning of

10   "has," which really shouldn't be debated.

11       And that's all I have with that, and unless your Honor

12   has any other questions...

13           THE COURT:  No.

14       This is all very helpful, very well presented.

15       Does anyone have to have the last word, or is that the

16   last word?

17           MS. McGILLYCUDDY:  Nothing further from the

18   plaintiff, your Honor.

19           THE COURT:  All right.

20       Good.  I will take the matters under advisement.  I

21   will try not to be terribly long with a decision for you.  I

22   know I am going to be seeing you again anyway probably soon.

23           MR. POLLACK:  Sure.

24           THE COURT:  We will be in recess on this matter

25   with thanks to counsel.

1          THE CLERK:  All rise.

2       (Proceedings adjourned.)

3

4

5                    **C E R T I F I C A T E**

6

7       I, James P. Gibbons, Official Court Reporter for the

8    United States District Court for the District of

9    Massachusetts, do hereby certify that the foregoing pages

10   are a true and accurate transcription of my shorthand notes

11   taken in the aforementioned matter to the best of my skill

12   and ability.

13

        /s/James P. Gibbons          March 25, 2024
14          James P. Gibbons

15

16

17

                 JAMES P. GIBBONS, CSR, RPR, RMR
18                  Official Court Reporter
                  1 Courthouse Way, Suite 7205
19               Boston, Massachusetts 02210
                   jamesgibbonsrpr@gmail.com
20

21

22

23

24

25